IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

JERMAINE DUNHAM,

                         Plaintiff,

against

LAMAR OLIVER, et al.,

                         Defendants.

CIVIL ACTION NO.: 11 Civ. 1223 (ALC) (SLC)

**OPINION AND ORDER**

**SARAH L. CAVE,** United States Magistrate Judge:

Before the Court is Plaintiff's Motion for Leave to Amend the Third Amended Complaint ("Third Am. Compl.") and File the Proposed Fourth Amended Complaint ("Fourth Am. Compl.") (ECF No. 107) (the "Motion").

For the reasons set forth below, Plaintiff's Motion is **GRANTED**.

## I.    PROCEDURAL HISTORY

On February 16, 2011, Plaintiff Jermaine Dunham ("Dunham") commenced this action by filing pro se a complaint that asserted claims under 42 U.S.C. § 1983 against Defendants the City of New York (the "City"), the New York City Police Department ("NYPD"), NYPD Commissioner Raymond Kelly, Police Officer Lamar[1] Oliver, and "John Doe" Physicians at Lincoln Hospital. (ECF No. 2). Dunham alleged that on or about February 14, 2008, he suffered serious injuries as a result of a police stop-and-frisk during which a police canine attacked and bit him several times. (Id.). Before service was effected, Dunham amended his complaint for the first time (ECF No. 12),

---

[1] The Clerk of Court is respectfully directed to update the spelling of Defendant Lamar Oliver's name in the case caption from "Lemar" to "Lamar." Officer Oliver's name was misspelled in the original complaint.

1

and then following service, he moved for leave to file the Second Amended Complaint. (ECF Nos. 30, 49) ("Second Am. Compl."). In an Opinion and Order dated May 2, 2014, the Honorable Andrew L. Carter, Jr., United States District Judge, granted the motion in part, allowing Dunham to assert claims against thirteen medical staff of Lincoln Medical and Mental Health Center ("LMMHC"), and denied the motion in part, declining to allow Dunham to add (i) state law tort claims against any defendants, (ii) the NYPD as a defendant, and (iii) the police dog as a defendant. (ECF No. 52). Dunham v. City of New York, No. 11 Civ. 1223 (ALC)(HBP), 2014 WL 1760330, at *4 (S.D.N.Y. May 2, 2014).[2]

The parties proceeded to document discovery, and Dunham retained the services of an attorney to represent him in this action. (ECF No. 45). Unfortunately, sometime in 2015, Dunham's attorney was suspended from the practice of law for one year, and the action was suspended for over two years while Dunham attempted to secure representation. (ECF Nos. 67, 68, 69). After his attorney failed to respond to any communications from Dunham or the Court, and after Dunham unsuccessfully sought both pro bono and retained counsel, Dunham elected to resume the litigation pro se, and sought leave to file the Third Amended Complaint. (ECF Nos. 701, 71, 72). The Honorable Henry B. Pitman, United States Magistrate Judge, granted Dunham's motion in part, allowing Dunham to assert a Section 1983 malicious prosecution claim against the existing Defendants, and denied the motion in part, declining Dunham's requests to assert state law claims and to add an individual defendant. (ECF No. 79).

---

[2] Judge Carter, in his Dec. 19, 2013 Order, considered Dunham's August 30 and September 7, 2013 submissions as his proposed Second Amended Complaint. (See ECF No. 49).

2

On March 29, 2018, Dunham filed the Third Amended Complaint, but the new pleading failed to comply with Magistrate Judge Pitman's Order by including state law claims and the individual defendant. (ECF No. 80). Unlike each of Dunham's prior pleadings, the Third Amended Complaint did not name the City of New York as a defendant. (Id.) Adopting Magistrate Judge Pitman's Report and Recommendation, Judge Carter granted Defendants' motion to dismiss the state law claims and the individual defendant. (ECF Nos. 82, 84). On August 8, 2018, Judge Carter entered an order directing the Clerk's Office to attempt to locate pro bono counsel for Dunham. (ECF No. 86). Attorneys from Sullivan & Cromwell, LLP subsequently entered notices of appearance to represent Dunham pro bono in the discovery phase of this action. (ECF No. 87, 88).

Following a June 20, 2019 status conference, Magistrate Judge Pitman noted that the City was not then a defendant in the action, but set a briefing schedule for the motion for leave to amend if Dunham elected to add the City as a defendant. (ECF No. 103). Through his pro bono counsel, Dunham timely filed the present Motion and accompanying proposed Fourth Amended Complaint, which seeks to reassert claims against the City as a defendant. (ECF Nos. 108, 108-1).

## II. RELEVANT FACTS AS ALLEGED IN THE FOURTH AMENDED COMPLAINT

### A. Events of February 15, 2008

Dunham's Section 1983 claims arise out of his arrest, detention, treatment, and prosecution as alleged in the Fourth Amended Complaint. (ECF No. 108-1). On February 15, 2008,[3] Dunham claims Officer Philip Lobello stopped him and asked him to produce

---

[3] Paragraph 10 of the Fourth Amended Complaint indicates a date of "February 15, 2009," but the context indicates that this is a typographical error and should instead read "February 15, 2008."

3

identification.  (ECF No. 108-1 ¶ 14).  Lobello was in his police vehicle, accompanied by an approximately 80-pound German Shepherd police dog named Rocco.  (Id. ¶ 12).  As Dunham reached for his identification in his pocket, Lobello exited his police car with an "agitated" Rocco on a leash.  (Id. ¶ 14).  Rocco was "barking very aggressively and repeatedly lunging towards Dunham."  (Id. ¶ 15).  Afraid of being bitten, "Dunham asked Lobello to hold the leash tighter," but Lobello said, "No.  He's an officer and he can search you too!"  (Id.).  On Dunham's information and belief, "Lobello's decision to deploy Rocco and his failure to curb Rocco's aggressive behavior was consistent with" NYPD practices of "encouraging or remaining deliberately indifferent to officers' disproportionate use of force against black civilians and encouraging or remaining deliberately indifferent to officers' use of excessive force."  (Id. ¶ 16).

After Lobello examined Dunham's identification and returned it to him, Dunham believed he was free to go and began to walk away, but Lobello put his hand on Dunham's chest to stop him from leaving.  (Id. ¶ 17).  Then, "[w]ithout any warning or provocation," Lobello released his hold on the leash and Rocco "immediately and viciously attacked Dunham."  (Id. ¶¶ 18–19).  Dunham did not resist the dog, and screamed for Lobello to stop the attack, but instead, Lobello encouraged Rocco to continue biting Dunham.  (Id. ¶ 19).  Rocco dragged Dunham onto the pavement, biting him on the head, neck, and left arm, causing Dunham to bleed to the point that he lost consciousness.  (Id. ¶¶ 20–21).

Eventually, Dunham was transported to LMMHC, where he was treated for his injuries, which included a 7.5-centimeter laceration on the left side of his neck, multiple lacerations on his left arm, and bites on his head.  (Id. ¶¶ 24–25).  He remained in the hospital for over a week, handcuffed to the bed and guarded by NYPD officers.  (Id. ¶ 26).  After his release from

LMMHC, he was "deprived of his liberty and kept in police custody." (Id.) As a result of the incident, Dunham's arm and neck remain disfigured, and he continues to experience severe physical and psychological pain and suffering. (Id. ¶ 27).

Sometime later, Dunham learned that at the time of his arrest, the NYPD, including Officer Lobello and Officer Lamar Oliver, who is also a defendant in this action, were searching for two black men, dressed in black, who had robbed a livery cab. (Id. ¶ 28). On the night of the incident, Dunham says that he "had a distinctive appearance," with his hair in long dreadlocks, a dark-colored winter jacket with faux-fur on the collar, blue pants, and tan boots. (Id. ¶ 29). "Other than being an African-American man," he alleges that he did not resemble the description of the suspects. (Id.). Officers Lobello and Oliver later made false statements to a grand jury, which indicted Dunham on four counts of robbery, of which a jury ultimately acquitted him. (Id. ¶¶ 30–31).

### B. Allegations Regarding Policies and Practices

Dunham alleges on information and belief that the actions of Officers Lobello and Oliver "were pursuant to longstanding and pervasive City policies or practices of encouraging, or remaining deliberately indifferent to, discrimination against African Americans in both stopping them and using excessive force against them." (Id. ¶ 32). Dunham maintains that Officer Lobello initially detained him because of his race, and then used excessive force against him pursuant to the NYPD's practice of "disproportionately using force against blacks without justification." (Id.)

5

He alleges that the City "maintained a policy or practice of failing to discipline officers who used excessive force," thereby empowering officers to use force without discipline. (Id. ¶ 33).

In support of his allegations regarding these policies and practices, Dunham includes in the Fourth Amended Complaint references to several external sources. First, he notes the finding of then-United States District Judge Shira A. Scheindlin that "the City has a custom of conducting unconstitutional stops and frisks" that are racially discriminatory. (Id. ¶ 34 (quoting Floyd v. City of New York, 959 F. Supp. 2d 540 (S.D.N.Y. 2013)). Dunham also cites publications that reported the heightened likelihood for black and Latino civilians to be stopped by the NYPD in comparison to white civilians. (Id. ¶ 35). With regard to his allegation that the NYPD had a practice or policy of disproportionately targeting black civilians with excessive force, Dunham cites to publications that describe the injuries that can result from police dog bites and an example of disproportionate use of police dogs in another jurisdiction. (Id. ¶¶ 36–37). He then cites to additional statistics and publications alleging the NYPD's disproportionate use of force against minority civilians in comparison to white civilians. (Id. ¶¶ 38–42).

Dunham alleges that, despite attention on "longstanding and pervasive racially discriminatory practices within the NYPD, the City has still not adequately addressed racial discrimination by NYPD officers." (Id. ¶ 42). He cites to reports from 2010 on that describe the City's alleged failure to discipline officers for bias or use of excessive force, and asserts that as a result, the NYPD has created an environment in which police officers are more likely to use force. (Id. ¶¶ 42–45). In particular, he cites to the October 1, 2015 report of the NYPD's Office of the

He alleges that the City "maintained a policy or practice of failing to discipline officers who used excessive force," thereby empowering officers to use force without discipline. (Id. ¶ 33).

In support of his allegations regarding these policies and practices, Dunham includes in the Fourth Amended Complaint references to several external sources. First, he notes the finding of then-United States District Judge Shira A. Scheindlin that "the City has a custom of conducting unconstitutional stops and frisks" that are racially discriminatory. (Id. ¶ 34 (quoting Floyd v. City of New York, 959 F. Supp. 2d 540 (S.D.N.Y. 2013))). Dunham also cites publications that reported the heightened likelihood for black and Latino civilians to be stopped by the NYPD in comparison to white civilians. (Id. ¶ 35). With regard to his allegation that the NYPD had a practice or policy of disproportionately targeting black civilians with excessive force, Dunham cites to publications that describe the injuries that can result from police dog bites and an example of disproportionate use of police dogs in another jurisdiction. (Id. ¶¶ 36–37). He then cites to additional statistics and publications alleging the NYPD's disproportionate use of force against minority civilians in comparison to white civilians. (Id. ¶¶ 38–42).

Dunham alleges that, despite attention on "longstanding and pervasive racially discriminatory practices within the NYPD, the City has still not adequately addressed racial discrimination by NYPD officers." (Id. ¶ 42). He cites to reports from 2010 on that describe the City's alleged failure to discipline officers for bias or use of excessive force, and asserts that as a result, the NYPD has created an environment in which police officers are more likely to use force. (Id. ¶¶ 42–45). In particular, he cites to the October 1, 2015 report of the NYPD's Office of the

Inspector General entitled "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices" (the "OIG Report"). (Id. ¶ 43).[4]

Dunham claims that the City's policies or practices of encouraging or tolerating racial discrimination in the use of force and NYPD officers' use of force against minorities directly caused his injuries. (Id. ¶ 46).

### C. Causes of Action

Dunham asserts five causes of action under 42 U.S.C. § 1983. First, Officer Lobello's use of a police dog to attack him "constituted excessive force in violation of the Fourth and Fourteenth Amendments." (Id. ¶ 50). Second, the failure of Officers Lobello and Oliver to provide him "with immediate medical attention constituted deliberate indifference to his medical needs in violation of the Fourteenth Amendment." (Id. ¶ 51). Third, Officers Lobello and Oliver's false statements and creation of false evidence regarding the robbery "constituted malicious prosecution in violation of the Fourth and Fourteenth Amendments." (Id. ¶ 52). Fourth, "the City encouraged, tolerated, or remained deliberately indifferent to the policy or widespread practice by NYPD officers of using excessive force against individuals in violation of the Fourteenth Amendment," and Officer Lobello acted "in conformance with this policy or practice" when he used Rocco to attack Dunham. (Id. ¶ 53). Fifth and finally, "the City encouraged, tolerated, or remained deliberately indifferent to the policy or widespread practice by NYPD officers of using disparate and excessive force against African Americans in violation of

---

[4] In his proposed pleading, Dunham also refers to a second, more recent report by NYPD's Office of the Inspector General (ECF No. 108-1 ¶ 42), as supporting his claim that, "regardless of the victim's race, the City tolerates the use of excessive force by failing to discipline officers even where excessive force was substantiated," the citation for which he corrects in his brief. (See ECF No. 116 at 10 n.9).

the Fourteenth Amendment," and Officer Lobello acted "in conformance with this policy or practice" when he used Rocco to attack Dunham. (Id. ¶ 54).

Dunham seeks compensatory damages against all Defendants, punitive damages against Officers Lobello and Oliver, reasonable attorneys' fees, and permanent injunctive relief preventing Defendants "from disproportionately using force against individuals based on their race or tolerating the use of excessive force by NYPD officers." (Id. ¶¶ 57–60).

### III. LEGAL STANDARDS

#### A. Standard for Leave to Amend

"The court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). The federal courts employ a "liberal policy toward allowing amendments to correct errors such as insufficiently stated claims" because it "is desirable and furthers the objective of determining cases on their merits." Bond v. Nolan, No. 89 Civ. 0357 (JFK), 1994 WL 132139, at *1 (S.D.N.Y. Apr. 11, 1994). In some circumstances, a court may even allow a party to amend "to assert new claims long after they have acquired the facts to support those claims." Id.

A district court may deny leave to amend "'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'" Dunham, 2014 WL 1760330, at *1 (quoting Holmes v. Grubman, 568 F.3d 329, 334 (2d Cir. 2009)). An amendment is futile if the claims plaintiff seeks to assert would not survive a motion to dismiss under Rule 12(b)(6). Dunham, 2014 WL 1760330, at *1. A claim will be dismissed under Rule 12(b)(6) if it fails to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Brodt v. City of N.Y., No. 13 Civ. 3272 (PKC), 2014 WL 896740, at *3 (S.D.N.Y. Mar. 6, 2014) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). Facial plausibility exists "when the

8

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

Under Rule 15(c), an amendment to a complaint may relate back to the original complaint for statute of limitations purposes if certain conditions exist. Fed. R. Civ. P. 15(c). If the amended claim "arose out of the conduct, transaction or occurrence set forth in the original pleading," Fed. R. Civ. P 15(c)(2), the amendment may be timely. See Bond, 1994 WL 132139, at *2. If the amendment seeks to add a new defendant, it may be timely if the claim "1) satisfies the requirements of Fed. R. Civ. P. 15(c)(2), 2) the proposed defendant has received notice within the period required for service of the summons and complaint, 3) the proposed defendant will not be prejudiced, and 4) the proposed defendant knew or should have known that but for a mistake as to the identity of the proper party, [it] would have been named." Bond, 1994 WL 132139, at *2; see Dunham, 2014 WL 1760330, at *3.

### B. Section 1983 Liability

A claim under Section 1983 must allege that the conduct was "committed by a person acting under color of state law," and "deprived [plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010) (internal citations omitted); Dunham, 2014 WL 1760330, at *3. A plaintiff must bring a Section 1983 claim within three years of the date the plaintiff knows or has reason to know of the injury. See Shomo v. City of New York, 579 F.3d 176, 181 (2d Cir. 2009); Dunham, 2014 WL 1760330, at *3.

A municipality may not be held liable under Section 1983 "unless action pursuant to official municipal policy of some nature caused a constitutional tort." Monell v. Dep't of Social

9

Servs., 436 U.S. 658, 691 (1978). To prevail on a Monell claim against a municipality under Section 1983 based on the acts of a public official, a plaintiff must prove: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008). The purpose of the fifth element of this inquiry is to ensure that a municipality is "not [] held liable under § 1983 solely because it employs a tortfeasor." Bd. of Cnty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 403 (1997). Thus, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional violation." Kucharczyk v. Westchester Cnty., 95 F. Supp. 3d 529, 538 (S.D.N.Y. 2015) (quoting City of Canton v. Harris, 489 U.S. 378, 385 (1989)).

Determining municipal liability requires the court to "conduct a separate inquiry" into whether there exists a "policy" or "custom." Davis v. City of New York, 228 F. Supp. 3d 327, 336 (S.D.N.Y. 2002), aff'd 75 F. App'x 827 (2d Cir. 2003). A plaintiff may satisfy the requirement to plead the "policy or custom" requirement by alleging:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

Kucharczyk, 95 F. Supp. 3d at 538–39 (quoting Brandon v. City of New York, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (internal citations omitted)). Normally, a "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof it was cause by an existing, unconstitutional municipal policy" that "can

be attributed to a municipal policymaker." Okla. City v. Tuttle, 471 U.S. 808, 823–24 (1985); see Brogdon v. City of New Rochelle, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002). The ultimate question is whether the plaintiff has sufficiently alleged "that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." Roe, 542 F.3d at 37 (quoting Brown, 520 U.S. at 404)).

At the pleading stage, the plaintiff "need not prove these elements, but still must plead them sufficiently to make out a plausible claim for relief." Kucharczyk, 95 F. Supp. 3d at 540. To survive a motion to dismiss a Monell claim, then, a plaintiff "cannot merely allege the existence of a municipal policy or custom, but 'must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists.'" Id. (quoting Santos v. New York City, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012); Brogdon, 200 F. Supp. 2d at 427 (dismissing Monell claim for failure to plead "evidence of the existence of any policy or custom, or a determination by a policy-making official that resulted in a violation of [plaintiff's] rights"). "[C]onclusory allegations of a municipal custom or practice of tolerating official misconduct are insufficient to demonstrate the existence of such a custom unless supported by factual details." Kucharczyk, 95 F. Supp. 3d at 540.

## IV.     ANALYSIS

### A.  The Monell Claim Relates Back And Is Therefore Timely

The City first opposes Dunham's request to add a Monell municipal liability claim on the ground that the claim does not relate back under Rule 15(c)(1)(C) and is therefore untimely. (ECF No. 115 at 5–8).  The Court disagrees.

First, Rule 15(c)(1)(C) is not the relevant provision for purposes of evaluating the timeliness of Dunham's proposed amendment.  Dunham named the City as a defendant in his original complaint (ECF No. 2), as well as in the First and Second Amended Complaints.  (ECF Nos. 12, 30).  Although Dunham, once again proceeding pro se after his disbarred attorney abandoned him and this action was suspended for more than two years, did not include the City on the list of named defendants in his Third Amended Complaint, as Judge Carter noted in ruling on Dunham's motion for leave to file the Second Amended Complaint, the New York City Charter requires that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law."  (ECF No. 52 at 4 (quoting N.Y.C. Charter Ch. 16 § 396)).  The City has thus effectively been a party-in-interest throughout this action.

Accordingly, the proper inquiry is not whether Dunham may assert a timely claim against a new defendant under Rule 15(c)(1)(C), but rather under Rule 15(c)(1)(B), which asks whether the new claim against an existing defendant "arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).  Dunham argues persuasively that his Monell claim against the City does share a "common core of operative facts," that is, Dunham's interactions with the NYPD on

12

February 15, 2008, with the facts he alleged in each of his prior pleadings. (ECF No. 109 at 11 (quoting Triano v. Town of Harrison, 895 F. Supp. 2d 526, 530 n.3 (S.D.N.Y. 2012)). The substance of his constitutional claims has remained the same as in the prior pleadings in which the City was named as a defendant: that he was wrongfully subjected to excessive force on account of his race, in violation of his constitutional rights. (Compare ECF No. 72-1 with ECF Nos. 2, 12, 49). Dunham's Monell claim rests on this "same factual core." Hood v. City of New York, 739 F. Supp. 196, 200 (S.D.N.Y. 1990).

The City concedes that it had notice of Dunham's lawsuit on the day it was filed (February 16, 2011[5]) (ECF No. 115 at 5), and that Dunham's pleadings are entitled to liberal interpretation. (Id. at 6). The City nevertheless contends that Dunham unduly delayed giving the City notice of his proposed Monell claim by waiting eight years after he first amended his complaint, to the prejudice of the City's defense. (ECF No. 115 at 7–10). In support, the City points to a footnote in Magistrate Judge Pitman's opinion on Dunham's motion for leave to file the Third Amended Complaint that listed the elements of a Monell claim as proof that Dunham "had failed to allege municipal liability" in that proposed pleading. (Id. at 8 citing ECF No. 79 at 27 n.10). That footnote, however, appears in the section of the opinion discussing the proposed malicious prosecution claim, and Magistrate Judge Pitman made no finding, express or implied, as to whether Dunham could allege a Monell claim. (ECF No. 79 at 27).

The City's delay argument overlooks the allegations in Dunham's proposed Second Amended Complaint about the City's responsibility for the actions of Officers Lobello and

---

[5] The City states that the Complaint was filed on February 11, 2011, but it appears on the docket on February 16, 2011, so the Court assumes that "February 11, 2011" is a typographical error.

Oliver: Dunham alleged that the City was "under a duty to train, instruct, supervise, direct and control" its police officers to interact "in a reasonable and prudent manner" both in their dealings with the general public as well as in making arrests and investigating crimes. (ECF No. 49 ¶¶ 45–46). As Dunham points out in his brief, these allegations have "no legal significance" unless he intended to assert a Monell claim. (ECF No. 109 at 13 (quoting Mask v. Johnson, No. 96 Civ. 6167 (DC), 1997 WL 662337, at *3 (S.D.N.Y. Oct. 22, 1997)). See also Hood, 739 F. Supp. at 201 ("The combination of the *pro se* complaint's allegations of unconstitutional acts on the part of the correction officers and the fact that the City was named as a defendant should have put the City on notice that plaintiff was attempting, albeit unsuccessfully, to assert some form of supervisory liability against it."). Furthermore, as Magistrate Judge Pitman previously noted, Dunham's omission of the City as a named defendant in his pro se Third Amended Complaint was inadvertent. (ECF No. 79 at 7.)

In addition, delay alone, "absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." State Teachers Ret. Bd. v. Fluor Corp., 654 F.2d 843, 856 (2d Cir. 1981); see also Parker v. Columbia Pictures Indus., 204 F.3d 326, 339 (2d Cir. 2000) ("[W]e have held repeatedly that 'mere delay' is not, of itself, sufficient to justify denial of a Rule 15(a) motion . . ."). Here, even though a significant period of time has passed prior to filing a motion to amend, there is an adequate explanation for the delay: the combination of his pro se status, the suspension of this action for over two years following his former attorney's disbarment, and what Magistrate Judge Pitman noted as the "inadvertent" omission of the City from his Third Amended Complaint (ECF No. 79 at 7). This combination of

factors constitutes a "plausible explanation" for the delay. Agerbrink v. Model Service LLC, 155 F. Supp. 3d 448, 453 (S.D.N.Y. 2016).

Finally, because the City has been participating in this action since the beginning and had notice of Dunham's Monell claims in the Second Amended Complaint, it will not be unduly prejudiced by allowing the amendment now. See Mask, 1997 WL 662337, at *2 (finding no prejudice where "the City ha[d] been involved in this case essentially since its inception"); Bond, 1994 WL 132139, at *4 ("Where there is constructive notice, generally there is also an absence of prejudice.")  Dunham is now represented by pro bono counsel expressly for the purposes of discovery (ECF Nos. 87, 88, 102), which will facilitate the parties' completion of discovery on the Monell claim, as well as any other remaining fact discovery.  All pretrial deadlines have been adjourned sine die, and no trial date has been set (ECF No. 103), so the City's ability to complete its defense is not at risk.  See Margel v. E.G.L. Gem Lab Ltd., No. 04 Civ. 1514 (PAC)(HBP), 2010 WL 445192, at *12 (S.D.N.Y. Feb. 8, 2010) (noting that "[t]he prejudice that would flow from any additional required discovery can generally be mitigated by adjustments to the discovery schedule").  The City has therefore not met its burden "of demonstrating that substantial prejudice would result" from allowing the amendment.  Agerbrink, 155 F. Supp. 3d at 454; see A.V. by Versace, Inc. v. Gianni Versace S.p.A., 87 F. Supp. 2d 281, 299 (S.D.N.Y. 2000) ("allegations that an amendment will require the expenditure of additional time, effort, or money do not constitute 'undue prejudice'").

Accordingly, the Court finds that Dunham's proposed Monell claim against the City relates back under Rule 15(c)(1)(B), and is therefore timely.

### B. Dunham's Amendment Would Not Be Futile

### 1. Dunham plausibly alleges one or more constitutional violations

Dunham's Monell claim presents two potential theories of municipal liability. First, he alleges that Officer Lobello's use of a police dog to attack him constituted excessive force in violation of the Fourth and Fourteenth Amendments. (ECF No. 108-1 ¶ 50). A police officer's use of force is excessive in violation of the Fourth Amendment if it is "objectively unreasonable in light of the facts and circumstances confronting them, without regard to the officers' underlying intent or motivation." Carpenter v. City of New York, 984 F. Supp. 2d 255, 267 (S.D.N.Y. 2013) (internal citation omitted). Whether the force used was unreasonable, and therefore excessive, involves a fact-specific inquiry that considers "(1) the severity of the crime at issue, (2) whether the arrestee poses an immediate threat to the safety of the officers or others, and (3) whether the arrestee is actively resisting arrest or attempting to flee." Marlin v. City of New York, No. 15 Civ. 2235, 2016 WL 4939371, at *11 (S.D.N.Y. Sept. 7, 2016) (citing Graham v. Connor, 490 U.S. 386, 396 (1989)). The severity of the plaintiff's alleged injuries is "highly relevant," although "not dispositive" to the analysis of whether the officer's force was reasonable. Marlin, 2016 WL 4939371, at *12 (quoting Johnson v. Police Officer #17969, 99 Civ. 3964, 2000 WL 1877090, at *5 (S.D.N.Y. Dec. 27, 2000)). If the injuries are more than de minimis, courts generally decline to dismiss on the pleadings, especially where the crimes are relatively minor or non-existent and the arrestee does not pose a physical threat. Marlin, 2016 WL 4939371, at *12.

The City appears not to dispute that Dunham has sufficiently alleged a Section 1983 excessive force claim. (See ECF No. 115 at 16 ("the only underlying constitutional claim is for

excessive force")). Here, Dunham does allege injuries that are more than de minimis (see supra Section II. B), and the allegations in the proposed Fourth Amended Complaint do not suggest that Dunham "posed a safety threat or was actively resisting arrest." Marlin 2016 WL 4939371, at *12; see also id. at *13 ("Despite the fact that the crimes at issue were not serious, and that Plaintiff posed no safety threat, the force used to arrest Plaintiff was great and the injuries he sustained were serious.") Although a grand jury ultimately indicted Dunham for the serious crime of robbery, at the time Officer Lobello allegedly unleashed Rocco on Dunham, Dunham alleges his race, rather than probable cause to believe he committed the robbery in question, was the reason for stopping him and using excessive force. (ECF No. 108-1 ¶ 32). Accordingly, Dunham has alleged a Fourth and Fourteenth Amendment excessive force claim on which a Monell claim could be predicated.

A second potential theory of municipal liability arises from Dunham's allegation that the officers' stopping him and using excessive force against him was racially discriminatory in violation of the Equal Protection Clause of the Fourteenth Amendment, which "essentially direct[s] that all persons similarly situated be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985). He maintains that his is a "prototypical" equal protection claim of racial discrimination. (ECF No. 116 at 7 (quoting Fierro v. N.Y.C. Dep't of Educ., 994 F. Supp. 2d 581, 591 (S.D.N.Y. 2014)). Although the City argues that Dunham "has adduced no evidence that, compared to those similarly situated to him, he has been selectively treated," (ECF No. 115 at 15 (emphasis added), the quantity of evidence is not the standard of review at this stage. (See supra p. 11). Here, Dunham has alleged that the reason Officer Lobello stopped him was that he, like the robbery suspect, was African American, and that Officer Lobello used

excessive force in the form of the police dog because of his race. (ECF No. 108-1 ¶ 32). Accepting these allegations as true at this stage of the proceedings, Dunham has cleared the first hurdle to asserting a Monell claim. See Ragusa v. City of New York, 222 F. Supp. 3d 297, 300 (S.D.N.Y. 2016) (noting that, sufficiently alleging the underlying constitutional violation is "the hurdle that trips up many 1983 plaintiffs").

### 2. Dunham plausibly alleges municipal policies

The City asks the Court to "disregard[]" Dunham's claims based on his stop or arrest, and then argues that Dunham's Monell claim fails for lack of "evidence of any practices about targeting black civilians for excessive force in 2008." (ECF No. 115 at 16). For the reasons set forth above, however, the Court has found that both the excessive force and the Equal Protection theories are viable predicates for the Monell claim. (See supra pp. 12–18).

Turning to whether Dunham has sufficiently alleged municipal custom or policy, Dunham points to the "facts regarding the NYPD's 'consistent and widespread' practice in 2008 of discriminating against black civilians, including Dunham, in violation of the Equal Protection Clause of the Fourteenth Amendment, by targeting them for stops, arrests and excessive force." (ECF No. 109 at 7). In support of his claim, he relies on the precedent in Floyd v. City of New York, in which Judge Scheindlin found that the "City's policy of targeting 'the right people' for stops clearly violates the Equal Protection Clause." (ECF No. 109 at 7 (quoting Floyd, 959 F. Supp. 2d at 661)). Dunham notes that Floyd was filed in January 2008 and that Judge Scheindlin ultimately found that "[f]or the period 2004 through 2009, after controlling for suspected crime and precinct characteristics, blacks who were stopped [by the NYPD] were about 14% more likely . . . than whites to be subjected to the use of force." 959 F. Supp. 2d at 560. Apart from

Floyd, Dunham also points to other publications that appear to be based on NYPD data and statistics "that demonstrate the City permitted and tolerated the NYPD's use of disproportionate force against blacks and failed to discipline officers who used excessive force." (ECF No. 116 at 9) (citing Fourth Am. Compl. ¶¶ 34–44); id. at 9 n.7 (listing publications that pre- and post-date 2008)).

The Court finds that these allegations sufficiently allege a municipal policy during the relevant time period to allow Dunham to include the Monell claim in his Fourth Amended Complaint  See Kucharczyk, 95 F. Supp. 3d at 544 (finding allegations supported by Department of Justice report that identified widespread practice to allege plausible Monell claim); Bishop v. City of New York, No. 13 Civ. 9203 (AJN), 2016 WL 4484245, at *4 (S.D.N.Y. Aug. 18, 2016) (allowing amendment to assert Monell claim for unconstitutional stop and frisk where plaintiff relied on Floyd and described "a number of forms of evidence" including statistics and whistleblower reports); Ragusa, 222 F. Supp. 3d at 300 (allowing amendment to assert "Monell claim based on the 'stop and frisk program' of New York City, which was in full swing at the time of th[e] incident").

The Court notes that some of the District Judges in this District have reached different conclusions regarding the sufficiency of the OIG Report to establish the municipal policy element of a Monell claim.  Compare Delorbe-Bell v. City of New York, No. 15 Civ. 2344 (LGS), 2016 WL 1451581, at *3–4 (S.D.N.Y. Apr. 12, 2016) (dismissing Monell claim that relied "exclusively" on the OIG report) and Boddie v. City of New York, No. 15 Civ. 4275 (GHW), 2016 WL 1466555, at *3 (S.D.N.Y. Apr. 13, 2016) (finding that the OIG report was insufficient to allege that the City was on notice of the alleged pattern of misconduct because the incident at

issue took place before the OIG report was published) with Marlin, 2016 WL 4939371, at *20–21 (finding that publications plaintiff cited, "coupled with the data" on which the OIG Report was based "provide[d] sufficient factual support to foreclose dismissal of the Monell claim").

Here, viewing the facts in the light most favorable to Dunham, as the Court must do in considering the proposed amendment, the Court finds that Dunham's allegations, which include but are not limited to the OIG Report, create a plausible inference that in February 2008 the NYPD had a policy or practice of stopping and using excessive force on the basis of race, that the City had notice of but did not remedy the policy or practice, as shown by the failure to discipline officers, and that the City's failure to act caused Dunham's injuries. See Marlin, 2016 WL 4939371, at *21.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Leave to Amend is **GRANTED**. Plaintiff shall file the Fourth Amended Complaint within fourteen (14) days of the date of this Opinion and Order, including the correct citations to the appropriate OIG reports in paragraphs 42 and 43 of the Fourth Amended Complaint.

Dated:　　　October 28, 2019
　　　　　　New York, New York

_____
SARAH L. CAVE
United States Magistrate Judge