**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x

Jermaine Dunham,

                      Plaintiff,                 No. 11-cv-01223-ALC-SLC

          -against-                   **FOURTH AMENDED COMPLAINT**

City of New York, Lamar Oliver, and
Philip Lobello                              **JURY TRIAL DEMANDED**

                    Defendants.

------------------------------------------------------- x

**FOURTH AMENDED COMPLAINT**

1.    Plaintiff Jermaine Dunham ("Dunham" or "Plaintiff") brings this action for money damages to redress defendants' violations of his rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983.

2.    Dunham brings this action against individual officer Philip Lobello ("Lobello"), who used unnecessary and excessive force in encouraging a police dog to attack Dunham, failed to timely provide him with medical attention for the injuries he sustained from the dog's bites, and made false statements to connect him to a robbery he did not commit. Individual officer Lamar Oliver ("Oliver") also failed to timely provide Dunham with medical attention and made false statements to connect Dunham to the robbery. Defendant City of New York (the "City") directly caused Dunham's injuries by its policies or practices of permitting and remaining deliberately indifferent to racial discrimination against African Americans—particularly with regard to officers' use of force—and tolerating police officers' use of excessive force.

## JURISDICTION AND VENUE

3. This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a).

4. Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C §§ 1391(b)(2) because the events or omissions giving rise to the plaintiff's claims occurred in the district.

## PARTIES

5. Plaintiff Jermaine Dunham is an African-American male resident of New York who is currently an inmate under the custody of the New York State Department of Corrections and Community Supervision at Wallkill Correctional Facility in Wallkill, New York.

6. Defendant City is a municipal corporation which operates the City of New York Police Department ("NYPD"), the law enforcement agency for the City.

7. Defendant Lobello was at all relevant times a police officer with the NYPD, shield number 21193. Lobello was assigned to the NYPD's canine unit and worked with a German Shepherd police dog called "Rocco."

8. Defendant Oliver was at all relevant times a police officer with the NYPD, shield number 22896, assigned to the NYPD's forty-second precinct in the Bronx.

## STATEMENT OF FACTS

9. On February 14, 2008, Valentine's Day, Dunham, wearing his hair in long dreadlocks and dressed in a dark-colored winter jacket with faux fur on the collar, traveled by subway from his home in Queens to the Bronx for a date with a woman named Jenny, whom he had met on the Internet but never visited before. On information and belief, Dunham arrived on the Number 5 train at the Freeman Street station at about 9:00 p.m. Jenny met Dunham at the

station, and together they walked approximately three long city blocks to a house party hosted by friends of Jenny.

10. At the party, Dunham had three alcoholic drinks over the course of a few hours before leaving alone at approximately 12:15 a.m. on February 15, 2008. Dunham attempted to find his way back home to Queens.

11. Dunham became lost while trying to find the subway station. When he saw a marked police car driving slowly up the road towards him, Dunham waved his arms to get the driver's attention in order to ask for directions to the subway station.

12. Defendant Lobello was driving this vehicle, accompanied by NYPD police dog Rocco. The dog, a German Shepherd, had been trained by the NYPD and weighed approximately eighty pounds. From the moment Dunham first saw the police dog, it was aggressively barking at him.

13. Remaining seated inside his police car, Lobello asked Dunham what he had been doing in the area. Dunham explained that he had been at a house party a few blocks away and was trying to find the subway train back to Queens.

14. Lobello then asked Dunham for identification, and Dunham reached for his identification card in his pocket. As Dunham was getting his identification card, Lobello instructed him to back up against a van parked at the side of the street. Lobello exited his police car with the agitated police dog on a leash.

15. The police dog continued barking very aggressively and repeatedly lunging towards Dunham. In fear that the dog would bite him, Dunham asked Lobello to hold the leash tighter. Lobello responded: "No. He's an officer and he can search you too!"

16. On information and belief, the only thing that prevented Rocco from attacking Dunham was Lobello's hold on his leash. On information and belief, Lobello's decision to deploy Rocco and his failure to curb Rocco's aggressive behavior was consistent with the NYPD policies and practices, discussed below, of encouraging or remaining deliberately indifferent to officers' disproportionate use of force against black civilians and encouraging or remaining deliberately indifferent to officers' use of excessive force.

17. Lobello examined Dunham's identification card and then handed it back to him. Fearing the dog would attack him and believing he was free to go, Dunham began to walk up the street past Lobello. Lobello placed his hand on Dunham's chest to prevent him from leaving.

18. Without any warning or provocation, Lobello then deliberately released his hold on the leash. Dunham did not have time to move or respond before the dog jumped on him.

19. The dog immediately and viciously attacked Dunham. Dunham did not resist or fight with the dog but screamed for Lobello to stop the attack. Instead, Lobello encouraged the dog to continue biting Dunham.

20. The dog quickly overpowered Dunham and dragged him onto the pavement, where it continued to bite him repeatedly on his head, neck, and left arm. At some point during the attach, Dunham lost consciousness from shock and loss of blood.

21. On information and belief, after Dunham lost consciousness, Lobello called by radio for other police officers to come to the scene. Defendant Oliver was among the officers who responded.

22. Dunham continued to bleed profusely, losing blood and fading in and out of consciousness. Rather than provide Dunham with the medical attention he required, the need for

which was apparent to any reasonable person, the officers showed no concern for Dunham and delayed calling medical personnel.

23.  Upon information and belief, Lobello and Oliver discussed and agreed during this time to implicate Dunham in the robbery of a livery cab that had occurred that night and with which Dunham had no connection.  Specifically, on information and belief Lobello and Oliver agreed to assert that Lobello had recovered from Dunham the keys to the car that had been robbed, and that he had given them to Oliver, who purportedly tested them in the car.  In fact, Dunham had never possessed the key, and was not aware that a robbery had been committed or that he had been arrested for that crime.

24.  After a lengthy delay, Dunham was transported to Lincoln Medical Center in the Bronx where he was treated for the injuries he suffered from police dog Rocco's attack at Lobello's direction.  According to the NYPD 2017 Use of Force Report, the NYPD classifies injuries resulting in admission to a hospital as serious injuries.

25.  Among other serious wounds, Dunham suffered a 7.5 centimeter laceration to the left side of his neck, multiple long lacerations to his left arm, and bites to his head.  The hospital records state that Dunham's wounds were still "actively bleeding" when he arrived at the hospital and that "deep platysma" muscle was visible from the bites.  Attached as Exhibit A are photographs of Dunham's wounds taken several months after the attack.

26.  Dunham remained in the hospital for more than a week recovering from his wounds.  During this time, he was handcuffed to his hospital bed and guarded by NYPD officers. After his release from the hospital, Dunham was deprived of his liberty and kept in police custody.

27. As a result of the attack, Dunham was disabled and unable to engage in normal physical activities for many months thereafter. Dunham's arm and neck remain severely disfigured, and he continues to experience severe physical and psychological pain and suffering as a result of the attack and his injuries. Dunham continues to have limited range of motion in his left arm and shoulder and frequently experiences nightmares relating to the attack. Whereas Dunham previously enjoyed spending time with dogs, they now make him severely anxious.

28. Dunham learned later that the police, including Officers Lobello and Oliver, at the time of his arrest were searching for two men who had robbed a livery cab near the intersection of Southern Boulevard and Freeman Street in the Bronx. The victim of this robbery had described the perpetrators in a 911 call as two black men dressed in black. Lobello testified that before Dunham's arrest he was looking for two black men, one "wearing a black hooded sweat shirt and the other one . . . a gray hooded sweat shirt."

29. On the night he was attacked and arrested, Dunham had a distinctive appearance. He wore his hair in long dreadlocks past his shoulders and his facial hair in a trimmed beard and mustache. Dunham was wearing a dark-colored winter jacket with faux fur on the collar, blue pants, and light tan boots. Other than being an African-American man, Dunham did not resemble the description of either of the two perpetrators.

30. As a result of Lobello and Oliver's false statements regarding Dunham, a grand jury indicted him on four counts of robbery. Dunham paid for a bond so that he could be released on bail pending trial.

31. Following a trial in which Lobello and Oliver repeated their false statements, a jury acquitted Dunham of the robbery charges.

32. Upon information and belief, the acts and omissions of Lobello and Oliver described above were pursuant to longstanding and pervasive City policies or practices of encouraging, or remaining deliberately indifferent to, discrimination against African Americans in both stopping them and using excessive force against them. Upon information and belief, Lobello initially detained Dunham because of his race, as Dunham did not otherwise meet the robbery victim's description. Lobello then used excessive force against Dunham pursuant to an NYPD practice of disproportionately using force against blacks without justification.

33. The City also maintained a policy or practice of failing to discipline officers who used excessive force, thus creating a work environment where officers such as Lobello felt empowered to use such force with impunity and officers who had previously used excessive force remained on the job.

34. During the period when Dunham was arrested, as recognized by a federal court in the Southern District of New York, the NYPD had a policy and practice of unconstitutionally discriminating against racial minorities in stopping civilians for suspected criminal activity. *Floyd* v. *City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013) (finding "the City has a custom of conducting unconstitutional stops and frisks" that is racially discriminatory).

35. At the time of Dunham's detention by Officer Lobello, black and Latino civilians were *nine times* more likely than whites to be stopped for search by the NYPD. Al Baker, *New York Minorities More Likely to Be Frisked*, N.Y. TIMES (May 12, 2010), https://www.nytimes.com/2010/05/13/nyregion/13frisk.html. Approximately 80% of total stops by the NYPD were of blacks and Latinos. RACIAL DISPARITY IN NYPD STOPS-AND-FRISKS: THE CENTER FOR CONSTITUTIONAL RIGHTS PRELIMINARY REPORT ON UF-250 DATA FROM 2005 THROUGH JUNE 2008, https://ccrjustice.org/sites/default/files/assets/Report-CCR-NYPD-Stop-and-Frisk_3.pdf.

36. The NYPD's unconstitutional and racially discriminatory practices were not limited only to affecting the types of civilians NYPD officers stop. At the time Dunham was attacked by police dog Rocco at Officer Lobello's direction, the NYPD also had a practice or policy of disproportionately targeting black civilians with excessive force. Upon information and belief, such excessive force included the use of police dogs, which, in other jurisdictions, have been disproportionately used to bite black civilians. See, for example, Mike Riggs, *So Far This Year, L.A. County Sheriff's Dogs Have Only Bitten People of Color*, Citylab (Oct. 9, 2013), https://www.citylab.com/equity/2013/10/so-far-year-l-county-sheriff-dogs-have-only-bitten-people-color/7189/.

37. The use of a police dog to apprehend an individual constitutes a "*significant degree of force.*" *Whitfield* v. *City of Newburgh*, 2015 WL 9275695, at *9 (S.D.N.Y. Dec. 17, 2015) (emphasis in original). "Police dogs 'are taught to inflict forceful bites using all of their teeth,' which can range from '1,200 and 2,000 pounds per square inch,' comparable to the amount of force caused by 'an automobile wheel running over a body part.'" *Id.* at *10 (quoting Peter C. Meade, *Police and Domestic Dog Bite Injuries: What are the Differences? What are the Implications About Police Dog Use?*, 37 INJURY EXTRA 395, 399 (2006), available at http://www.sciencedirect.com); *see also* Martin Kaste, *Videos Reveal A Close, Gory View Of Police Dog Bites*, NPR (Nov. 20, 2017), https://www.npr.org/2017/11/20/563973584/videos-reveal-a-close-gory-view-of-police-dog-bites ("The new generation of videos is capturing scenes of K9 arrests that are bloodier and more violent than imagined by the public.").

38. Research has shown persistent racial bias in the application of force at all non-lethal levels. Between 2003 and 2013, NYPD officers disproportionately used force against minorities as compared to white civilians: black civilians were, on average, 17.8% more likely to

be handled with force than similarly situated white civilians. Roland G. Fryer, Jr., *An Empirical Analysis of Racial Differences in Police Use of Force* (Nat'l Bureau of Econ. Research, Working Paper No. 22399, 2016, rev. 2018), Table 3A, https://www.nber.org/papers/w22399.pdf.

39. Even when considering "perfectly compliant individuals" and controlling for other factors (including the crime rate in the relevant area and the civilians' behavior) that could explain the disparities in the use of force, black civilians were over 21% more likely to have force used against them than similarly situated whites. *Id.* at 35, Figure 1. That disparity in particular demonstrates that the NYPD repeatedly targeted black civilians with excessive force based on intentional racial discrimination, rather than because of another variable.

40. Other researchers have confirmed these findings. *See* Rory Kramer and Brianna Remster, *Stop, Frisk, and Assault? Racial Disparities in Police Use of Force During Investigatory Stops*, 52 LAW & SOC'Y REV. 960, 987 (2018) (using New York City data and finding "individuals are not only more likely to be stopped by police, they are also more likely to be subjected to police use of force during that interaction, and more likely to be seen as threatening to officers"); GREG RIDGEWAY, ANALYSIS OF RACIAL DISPARITIES IN THE NEW YORK POLICE DEPARTMENT'S STOP, QUESTION, AND FRISK ANALYSIS 42 (Rand Corp. eds., 2007) (finding "[o]n average, nonwhites experience more intrusive stops than do similarly situated white suspects").

41. The popular press has extensively reported on these discriminatory practices, thereby putting senior policymakers with the NYPD and the City on notice. As an example of the City's awareness of the NYPD's racial bias, in a 2016 address, New York City Mayor Bill de Blasio called for implicit bias training for NYPD officers. Al Baker, *Confronting Implicit Bias*

*in the New York Police Department*, N.Y. TIMES (July 15, 2018), https://www.nytimes.com/2018/07/15/nyregion/bias-training-police.html.

42. Despite this abundance of information about longstanding and pervasive racially discriminatory practices within the NYPD, the City has still not adequately addressed racial discrimination by NYPD officers. Since 2014, the NYPD has *never* substantiated a complaint accusing police officers of bias, despite receiving approximately 2,500 formal complaints during that period, with racial bias being the most common complaint. OFFICE OF THE INSPECTOR GENERAL FOR THE NYPD, EXAMINATION BY DOI'S OFFICE OF THE INSPECTOR GENERAL FOR THE NYPD IDENTIFIES DEFICIENCIES AND RECOMMENDS IMPROVEMENTS IN HOW NYPD HANDLES COMPLAINTS OF BIASED POLICING (2019), https://www1.nyc.gov/assets/doi/reports/pdf/2019/Jun/19BiasRpt_62619.pdf; *see also* Ali Watkins, *2,495 Reports of Police Bias. Not One Was Deemed Valid by the N.Y.P.D.*, N.Y. TIMES (June 26, 2019) ("In a report issued on Wednesday, a city watchdog agency found the investigations of these complaints against the police lacking, and recommended changes to how the department classifies and handles bias allegations.").

43. The City also has a practice or policy of failing to discipline officers "even when provided with evidence of excessive force." OFFICE OF THE INSPECTOR GENERAL FOR THE NYPD, POLICE USE OF FORCE IN NEW YORK CITY: FINDINGS AND RECOMMENDATIONS ON NYPD'S POLICIES AND PRACTICES (2015), http://www.nyc.gov/html/oignypd/assets/downloads/pdf/oig_nypd_use_of_force_report_-_oct_1_2015.pdf. Between 2010 and 2013, the NYPD declined to impose discipline in 44.1% of substantiated excessive force allegations. *Id.*

44. Between 2011 and 2015 "at least 319 [NYPD] officers . . . had committed fireable offenses yet were allowed to keep their jobs," including "at least 250 employees [who] faced

allegations of excessive force." U.S. COMM'N ON CIVIL RIGHTS, POLICE USE OF FORCE: AN EXAMINATION OF MODERN POLICING PRACTICES 61 (2018), https://www.usccr.gov/pubs/2018/11-15-Police-Force.pdf.

45. Through its practice of failing to discipline officers who use excessive force, the NYPD created a work environment in which officers such as Lobello are more likely to use excessive force.

46. These City policies or practices of encouraging or tolerating racial discrimination in the use of force and NYPD officers' use of excessive force against minorities directly caused Dunham's injuries.

## CAUSES OF ACTION

### FOURTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION PURSUANT TO 42 U.S.C. § 1983

47. As against all defendants, Dunham repeats and realleges paragraphs 9-47 as though fully set forth herein.

48. Defendants conduct violated Dunham's constitutional rights, was under color of state law, and may be redressed by 42 U.S.C. §1983.

49. Defendants' acts and omissions were based on Dunham's race in violation of the Equal Protection Clause of the Fourteenth Amendment. Lobello and Oliver acted pursuant to Defendant City's policies or practices of encouraging, permitting, and/or remaining deliberately indifferent to NYPD officers' use of excessive force and disproportionate force against African Americans.

50. As and for a first cause of action, Lobello's use of the police dog to attack Dunham constituted use of excessive force in violation of the Fourth and Fourteenth Amendments.

51.     As and for a second cause of action, Lobello and Oliver's failure to provide Dunham with immediate medical attention constituted deliberate indifference to his medical needs in violation of the Fourteenth Amendment.

52.     As and for a third cause of action, Lobello and Oliver's false statements and creation of false evidence regarding Dunham's purported participation in a robbery, without reasonable grounds to believe the plaintiff committed the robbery, constituted malicious prosecution in violation of the Fourth and Fourteenth Amendments.

53.     As and for a fourth cause of action, the City encouraged, tolerated, or remained deliberately indifferent to the policy or widespread practice by NYPD officers of using excessive force against individuals in violation of the Fourth Amendment.  Officer Lobello acted pursuant to and in conformance with this policy or practice when he used the police dog to attack Dunham in violation of his constitutional rights.

54.     As and for a fifth cause of action, the City encouraged, tolerated, or remained deliberately indifferent to the policy or widespread practice by NYPD officers of using disparate and excessive force against African Americans in violation of the Fourteenth Amendment. Officer Lobello acted pursuant to and in conformance with this policy or practice when he used the police dog to attack Dunham in violation of his constitutional rights.

55.     The deprivations of Dunham's rights described herein were not reasonably related to the furtherance of any legitimate interest in security or any other legitimate interest.

56.     Defendants' actions and omissions caused Dunham to endure substantial and unnecessary discomfort, pain, humiliation, deprivation of liberty, and physical injury.  Dunham continues to suffer both physically and psychologically as a result of the defendants' conduct.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff requests that the Court grant Plaintiff the following relief:

57. Award compensatory damages against the defendants jointly and severally in an amount to be determined at trial for the physical and psychological injuries sustained by Mr. Dunham as a result of the events alleged herein.

58. Award Dunham punitive damages against Lobello and Oliver.

59. Award Dunham reasonable attorneys' fees from the defendants together with the costs of this action pursuant to 42 U.S.C. § 1988.

60. Issue an order permanently enjoining Defendants and their officers, agents, affiliates, subsidiaries, servants, employees and all other persons or entities in active concert or privity or participation with them, from disproportionately using force against individuals based on their race or tolerating the use of excessive force by NYPD officers.

61. Issue such other and further relief as the Court may deem just and equitable.

Dated: November 4, 2019
      New York, New York

        */s/ Stephen J. Elliot*

Stephen J. Elliott
Jason Kornmehl
Maxwell Brown
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Phone: (212) 558-4000
Fax: (212) 558-3588
E-mail: elliots@sullcrom.com
        kornmehlj@sullcrom.com
        brownmax@sullcrom.com

*Attorneys for Plaintiff Jermaine Dunham*